UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Cynthia Yeager

        v.                          Civil No. 05-cv-412-JD

Jo Anne B. Barnhart, Commissioner
Social Security Administration


O R D E R

    Cynthia Yeager seeks judicial review pursuant to 42 U.S.C. §
405(g) of the denial of her application for disability insurance
benefits.  She contends that the effects of fibromyalgia,
degenerative disc disease, and Lyme disease prevent her from
engaging in any substantial gainful activity and that the
Administrative Law Judge ("ALJ"), Robert Klingebiel, erred in
denying her application.  The Commissioner moves to affirm the
decision denying benefits.


Background

    Yeager filed an application for social security benefits on
August 15, 2001, after she hurt her back at work on September 7,
2000.  The ALJ held a hearing on her application and then issued
a decision on November 25, 2002, denying her application.  Yeager
sought judicial review, and on May 28, 2004, this court remanded
the case for further administrative proceedings.  A second
hearing was held on April 7, 2005, following which the ALJ again
determined that Yeager was not disabled.  Yeager again seeks

judicial review of the decision to deny her application for benefits.

Yeager has a high school education and was forty-six years old when the ALJ denied her application for benefits.  She has worked previously in a variety of grocery store jobs and as a payroll clerk, an assembly line worker, and a warehouse worker. She has not worked since March of 2001 and claims that she is disabled due to fibromyalgia, chronic back pain, and the effects of Lyme disease.

After her back injury at work, Yeager was seen by Jennifer Warren, M.D., on September 12, 2000.  X-rays and a bone density scan showed normal results.  Dr. Warren referred her to physical therapy.  Dr. Warren noted that Yeager has improved with physical therapy but still had back pain.  Dr. Lux evaluated Yeager on October 19, 2000.  Yeager reported that she had returned to work for three hours a day.  Dr. Lux reported that Yeager was taking Zoloft and over-the-counter medications for pain.  Dr. Lux found that she had low back pain in the setting of fibromyalgia, which was complicating her recovery, and that she had not made much progress.  In November of 2000, Dr. Lux found normal results on examination but Yeager complained of pain and of difficulty doing household chores.

Yeager saw Dr. Glassman on November 28, 2000, who found normal results on examination except that she had limited hip

extension due to pain.  Dr. Glassman diagnosed lumbar strain, prescribed medications to address back pain, and released Yeager to part-time work.  He found the same results in December.

On January 29, 2001, Yeager had a lumbar magnetic resonance imaging study that showed degenerative disc disease in the lumbar area.  In February, Dr. Lux noted that Yeager did not appear uncomfortable and that she said she had recovered eighty percent but could not lift more than ten pounds.  At her appointment in March, Dr. Glassman found no problems on examination and released her to full-time work as of April 9, 2001.  On April 10, 2001, Yeager began treatments with Robert Bishop, D.O., for right shoulder pain and headaches.  A "head Computed Tomography Scan" showed normal results.

In July of 2001, Yeager saw Kathleen Kidder, a nurse practitioner ("NP") who worked with Dr. Lux.  NP Kidder reported that Yeager's depression was stable, her fibromyalgia was worse due to working, her hands and ankles were swollen, and she appeared tired.  NP Kidder gave Yeager a note not to lift at work and referred Yeager to Dr. Roger Diegel at Dartmouth Hitchcock Medical Center, who evaluated Yeager on July 17, 2001.  Dr. Diegel found no abnormal results on range of motion, reflexes, or flexion but stated that Yeager's fibromyalgia and low back pain decreased her endurance and functional abilities.  He encouraged Yeager to do daily exercises and physical therapy and to take anti-depressant medication.

3

In August of 2001, Yeager completed an Activities of Daily Living Questionnaire in which she stated that each morning she fed her cat, her rabbits, and her sheep; fixed coffee, and checked her email.  During the day, she watched television, knitted, spun wool, did laundry and light cleaning, and walked outside.  She said she was frustrated because she could not do things as well has she had in the past and that her husband did the cooking and shopping because she could not lift anything heavier than five pounds.

NP Kidder reported that Yeager was worse at her August appointment.  In November of 2001, NP Kidder reported that Yeager was taking Zoloft and occasionally walked as if in pain.  She diagnosed back pain and fibromyalgia with stable depression.  In January of 2002, NP Kidder reported that Yeager's depression had improved, her back pain was stable, and that she had muscle and joint pain due to fibromyalgia.

Also in January of 2002, a state agency physician, Dr. Fairley, provided a functional capacity assessment, based on Yeager's medical records.  He found that Yeager could perform at a level consistent with light work but that she should avoid frequent bending, stooping, and similar activities and should avoid work that required frequent overhead reaching and tight grasping.  NP Kidder completed a mental impairment questionnaire in which she indicated that although Yeager had depression secondary to pain, she had normal process and interaction and

4

could perform activities of daily living.  Evaluations of
Yeager's psychological condition done in February reported that
she would have difficulty maintaining concentration for an eight-
hour period, although she could concentrate for extended periods
and could interact appropriately with co-workers.  In May of
2002, Dr. Levy of Concord Orthopedics Professional Association
noted that Yeager's MRI showed degenerative disc disease but that
she was not a surgical candidate because she had no significant
disc herniation or nerve root impingement.

        In July of 2002, NP Kidder completed a functional capacity
questionnaire in which she found that Yeager could lift twenty
pounds occasionally and less than ten pounds frequently, that she
could stand less than two hours in an eight hour day, and would
need to alternate between sitting and standing.  She also limited
other activities such as balancing, stooping, and fingering to
occasional.  NP Kidder noted that her answers on the
questionnaire were based on Yeager's reports to her.  Similarly,
Dr. Bishop wrote in July of 2002 that he could not do a
functional capacity assessment of Yeager because it would have to
be based entirely on her subjective complaints.

        In April of 2003, Yeager began treatment with Dr. Carr.  He
found she could walk on her heels and toes and had good back
flexibility and concurred that her diagnosis of fibromyalgia was
probably appropriate.  The test results showed a fifty percent
possibility that Yeager also had Lyme disease which could cause

muscle pain.  Dr. Carr prescribed antibiotic therapy in May of
2003.  In June, Yeager reported a decrease in back pain and an
increase in energy but also that the medication was causing
nausea and body aches.  Over the next several months, Dr. Carr
adjusted Yeager's Zoloft prescription due to sleep problems.
Yeager's reports to Dr. Carr and to NP Kidder over the next
several months showed some increases and decreases in her pain
and fatigue levels.  Dr. Carr adjusted her medications to avoid
side effects.

In 2004, Yeager saw NP Kidder for complaints of chronic pain
but she found normal muscle tone, strength, attention span, and
concentration.  Yeager reported to Dr. Carr that she had only
mild pain and fatigue eighty percent of the time but felt worse
the rest of the time.  Dr. Carr reported that Yeager was worse at
the end of October, noted that her illness was the type that
waxed and waned, and that she could not maintain full-time
gainful employment.

Also in October of 2004, Dr. Bishop completed a functional
capacity questionnaire in which he stated that Yeager could
occasionally lift and carry ten pounds but less than that
frequently, that she could stand for at least two hours, that she
would need to alternate between sitting and standing, that she
had a limited ability to push, pull, and reach, and that she
could never crouch or stoop.  Dr. Carr completed a residual
functional capacity questionnaire in November of 2004 in which he

diagnosed Yeager with chronic Lyme disease, low back pain, and a sleep and mood disorder. He cited a positive trigger point exam and her response to antibiotics as objective signs of her conditions. He found that she could stand for less than two hours in a day, that she would often need bed rest and reclining, that she could rarely lift ten pounds, that she could never bend, twist, crouch, or climb, and that she would miss more than four days a month from work.

NP Kidder also did a physical and mental functional capacity assessment of Yeager in November of 2004. She found that Yeager could lift and carry less than ten pounds, could stand for six hours in an eight hour day, could only occasionally balance, kneel, and similar activities, and would have no manipulative limitations. Kidder found that Yeager had no mental limitations.

The first hearing on Yeager's claim was held on August 6, 2002, which resulted in a decision denying her claims. That decision was remanded for further proceedings following review by this court. The second hearing was held on April 7, 2005.

Yeager testified at the second hearing that she had fibromyalgia and Lyme disease that caused swelling in her hands, feet, and hips and that she had increased pain due to the antibiotics she took for Lyme disease. She said she had been diagnosed with fibromyalgia and had been receiving treatment for her back for twenty years. She also testified that she had lost her fine motor skills and dropped things, that she had difficulty

7

with speech and balance, and that she had difficulty with short-term memory.  She said that she was able to knit small items that she sometimes sold at the farmers' market, that she was able to feed and water her flock of sheep and lambs every day, but that she could not do housework for any extended time.  She said that she could not bend, stoop, or crouch, but that she could drive a car for about a half an hour.  She described her pain level generally as a five out of ten with ten being the most severe. She used aspirin to relieve back pain and headaches.  At the time of the hearing, she was not on medication for Lyme disease, because her doctor had taken her off medication to determine whether the Lyme disease was gone.  She described her pain during the hearing as at a level of eight.

In his question to the vocational expert, the ALJ described a hypothetical person with Yeager's age, educational level, and work experience and who could lift twenty pounds occasionally and ten pounds frequently, could do overhead reaching only occasionally, would need to alternate between sitting and standing, and would have to avoid frequent use of the hands.[1] The vocational expert responded that those criteria ruled out

---

[1]Although the parties provided this version of the ALJ's hypothetical in their joint factual statement, his actual words were as follows:  "if 20 pounds was the maximum but that's only occasionally perhaps even infrequently, 10 pounds being the norm for the most part and perhaps even lighter than 10 pounds as part of the typical work activity."  Tr. at 315.

Yeager's past work but would permit work as an information clerk, a surveillance systems monitor, a companion, and a gate guard. In response to questions from Yeager's counsel, the vocational expert testified that a limitation that required the person to leave her work station for ten minutes every half hour would preclude all of the jobs.

The ALJ issued his decision on July 21, 2005, in which he found that Yeager had severe impairments caused by her chronic low back pain, fibromyalgia syndrome, and Lyme disease but that she retained the functional capacity to lift twenty pounds occasionally and up to ten pounds frequently, which is consistent with work at the light exertional level. The ALJ also found that Yeager needed to be able to sit and stand as needed, could only do overhead reaching occasionally, and could not do repetitive hand activities. The ALJ stated that using the Medical-Vocational Guidelines ("the Grid") as a framework, there were a significant number of jobs she could do and listed the jobs found by the vocational expert as examples of work Yeager could do. As a result, the ALJ determined that Yeager was not disabled.

The parties' joint factual statement indicates that Yeager's counsel sent certain additional medical records to the Appeals Council, and the administrative record includes the cover letter to the Appeals Council, forwarding those materials. The record, however, does not include any disposition of the case by the Appeals Council nor do the parties indicate in their joint

factual statement what disposition issued.  Instead, the parties
state that Yeager has exhausted her administrative remedies.
Because it appears that Yeager at least requested review by the
Appeals Council, she has exhausted her administrative remedies.
See Sims v. Apfel, 530 U.S. 103, 106-07 (2000).  However, because
the ALJ's decision is deemed to be the decision of the
Commissioner and Yeager does not contend that the Appeals
Council's decision was egregiously mistaken, the additional
medical records will not be included in the review here.  Mills
v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001).


                            Discussion
     The court must uphold a final decision of the Commissioner
denying benefits unless the decision is based on legal or factual
error.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d
15, 16 (1st Cir. 1996) (citing Sullivan v. Hudson, 490 U.S. 877,
885 (1989)).  The Commissioner's factual findings are conclusive
if based on substantial evidence in the record.  42 U.S.C. §
405(g).  Substantial evidence is "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971)
(internal quotation marks omitted).  In making the disability
determination, "[i]t is the responsibility of the [Commissioner]
to determine issues of credibility and to draw inferences from

the record evidence." <u>Irlanda Ortiz v. Sec'y of Health & Human</u>
<u>Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991).

Yeager contends that the ALJ erred in his evaluation of her
subjective complaints, erred in his residual functional capacity
assessment, and failed to sustain the Commissioner's burden to
show that Yeager can do work other than her previous work.
Yeager's application was denied at step five of the sequential
evaluation process set forth in 20 C.F.R. § 404.1520.[2]  At step
five, the Commissioner has the burden to show that despite the
applicant's severe impairment, she retained the residual
functional capacity to do work other than her prior work and that
work the claimant can do exists in significant numbers in the
relevant economies.  <u>See</u> <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st
Cir. 2001); <u>Heggarty v. Sullivan</u>, 947 F.2d 990, 995 (1st Cir.
1991).  The opinion of a vocational expert constitutes
substantial evidence to support the Commissioner's decision at
step five as long as the hypothetical posed to the vocational

_____

[2]The ALJ is required to make the following five inquiries
when determining if a claimant is disabled:
    (1) whether the claimant is engaged in substantial gainful
activity;
    (2) whether the claimant has a severe impairment;
    (3) whether the impairment meets or equals a listed
impairment;
    (4) whether the impairment prevents the claimant from
performing past relevant work; and
    (5) whether the impairment prevents the claimant from doing
any other work.  <u>See</u> 20 C.F.R. § 404.1520.

expert accurately reflected the claimant's residual functional capacity and limitations.  Rose v. Sec'y of Health & Human Servs., 35 F.3d 13, 19 (1st Cir. 1994); Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374 (1st Cir. 1982).

A.   Subjective Complaints of Pain

Yeager contends that the ALJ erred in concluding that she was not entirely credible as to the limitations she claimed were caused by pain due to fibromyalgia, Lyme disease, and degenerative disc disease.  She argues that the ALJ ignored pertinent evidence and "provided a slanted interpretation of the evidence in the record as it applied to credibility."  Pl. Mem. at 7.  The Commissioner argues that the ALJ properly evaluated Yeager's subjective complaints and that substantial evidence supports his credibility determination.

Fibromyalgia is "a rheumatic syndrome that causes pain in muscles, tendons, and fibrous and other connective tissues." Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 267 (5th Cir. 2004); see also Licciardi v. TIG Ins. Group, 140 F.3d 357, 359 at n.3 & 363 (1st Cir. 1998).  Fibromyalgia presents a difficult problem for assessing credibility because the disease does not cause objective medical symptoms, other than trigger points, and evaluation of the disease is largely based on a claimant's subjective reports.  See Benecke v. Barnhart, 379 F.3d

587, 590 (9th Cir. 2004); <u>Green-Younger v. Barnhart</u>, 335 F.3d 99,
108 (2d Cir. 2002).  Nevertheless, a disability claimant's
subjective reports of her limitations due to fibromyalgia are not
immune from a credibility determination.  <u>Boardman v. Prudential
Ins. Co. of Am.</u>, 337 F.3d 9, 17 n.5 (1st Cir. 2003); <u>Lacroix v.
Barnhart</u>, 352 F. Supp. 2d 100, 114 (D. Mass. 2005);

Because a claimant's impairments may be greater due to pain
than the objective medical evidence would otherwise suggest, an
ALJ must also consider a claimant's subjective complaints of
pain.  20 C.F.R. §§ 404.1529(c)(1); <u>Avery v. Sec'y of Health &
Human Servs.</u>, 797 F.2d 19, 21 (1st Cir. 1986).  The ALJ's
evaluation of the claimant's subjective complaint "cannot be
based on an intangible or intuitive notion about an individual's
credibility . . . [and][i]t is not sufficient to make a
conclusory statement . . . [or] simply to recite the factors that
are described in the regulations for evaluating symptoms."
S.S.R. 96-7p, 1996 WL 374286, at *4 (July 2, 1996).  Instead, the
ALJ is required to consider the claimant's descriptions of her
daily activities; the location, duration, frequency, and
intensity of her pain; the type and amount of any medications she
is taking or has taken for pain or other symptoms; other
treatments she has received or is receiving for pain or other
symptoms; any measures she is using or has used to relieve pain,
and other information about her limitations and restrictions due

13

to pain or other symptoms.  § 404.1529(c)(3).  The ALJ must then
provide specific reasons in his decision for the credibility
findings as to each of the required factors, supported by
references to the evidence of record.  S.S.R. 96- 7p, 1996 WL
374286, at *4 (July 2, 1996).

The ALJ considered Yeager's descriptions of her daily
activities, including walking two miles a day, caring for her
animals, knitting and spinning wool, working part time,
performing household chores, reading, driving, and interacting
with friends.[3]  Yeager contends that the ALJ unfairly depicted
her as remaining "quite active," when she was more limited in her
activities than the ALJ described.  In particular, Yeager argues
that her descriptions of her activities show that she cannot
sustain any of the described activities over a full day and
therefore cannot do substantial gainful activity.  At this stage
in the analysis, however, the ALJ assesses the credibility of
Yeager's complaints, not the effect of her described limitations,
and the record supports the ALJ's description of her activities.

With respect to the location, duration, frequency, and
intensity of Yeager's pain, the ALJ noted the discrepancies and

---

[3]Yeager testified that she feeds her flock of sheep every
morning, on both her good days and bad days.  That activity
entails walking 200 feet from the house to the barn, opening the
sliding barn door, sliding the gate to the sheep pen open, and
throwing hay in with a pitchfork, which she completes in ten to
fifteen minutes.

variations among her complaints and her health care providers'
findings and recommendations.  The ALJ also noted that the health
care providers relied on Yeager's own reports about her pain in
the absence of objective medical findings.  He found Yeager's
descriptions of the degree of her pain and limitations to be
inconsistent with the remainder of the record.  Although
variations in symptoms and the lack of objective medical findings
are consistent with fibromyalgia and therefore not a basis for
discounting a claimant's credibility, the ALJ correctly noted the
wide variations in the reports of Yeager's medical care providers
about her condition.

     Yeager testified that she had been treated for fibromyalgia
and back pain for twenty years, although her claim for benefits
indicated that her impairments began with a work injury in
September of 2000.  She also testified that many of her worse
symptoms were the result of Lyme disease and the antibiotics used
to treat it.  At the time of the second hearing, however, she was
not being treated for Lyme disease, because her doctor was
testing to see if she had recovered from it.  Yeager testified at
the second hearing that her pain level was at an eight with ten
being the highest, and yet she was able to participate in the
hearing without difficulty.  Although the ALJ erred in expecting
to find objective symptoms of fibromyalgia, other than the
diagnostic trigger points, the record otherwise supports the
inconsistencies in Yeager's complaints that the ALJ noted.

15

The ALJ found that Yeager has not required strong pain medication and that her physical therapy treatments had been brief and intermittent.  In response, Yeager lists a variety of medications that had been prescribed for her in the past.[4] Yeager testified, however, that she was taking no medication at the time of her first hearing on August 6, 2002, and she testified that at the time of the second hearing, on April 7, 2005, she had been taking aspirin and Tylenol for pain, but no other medications.[5]  Although she apparently had tried other pain medications at times, including Naprosyn and Vioxx, it is not clear what course of treatment she followed as to any pain medication.

Given the difficulty of assessing the effects of fibromyalgia, the record could be interpreted in different ways that are more or less sympathetic to Yeager and to her version of the extent and degree of her pain.  As is noted above, however, the ALJ is responsible for deciding credibility issues, including drawing inferences from the record and resolving conflicts in the evidence.  Irlanda Ortiz, 955 F.2d at 769.  Further, the court

---

[4]Most of these medications were not included in the parties' joint factual statement.  Zoloft was prescribed to treat depression; Flexeril is a muscle relaxant, and Relafen is an anti-inflammatory medication.

[5]Yeager testified that she had been taking three tablets of extra-strength Tylenol or aspirin every three or four hours.  She had stopped taking Tylenol, and it was not clear if she was still taking aspirin.  She also testified that she had stopped taking Flexeril.

will remand a case based on an ALJ's credibility determination
only if it is "patently wrong."  Schmidt v. Barnhart, 395 F.3d
737, 746-47 (7th Cir. 2005).  Therefore, the ALJ adequately
assessed Yeager's credibility as to her subjective complaints
under the applicable factors.[6]

B.  Residual Functional Capacity

    Determining a Social Security applicant's residual
functional capacity is an administrative decision that is the
responsibility of the Commissioner.  20 C.F.R. § 404.1527(e)(2).
"Ordinarily, [residual functional capacity] is an assessment of
an individual's ability to do sustained work-related physical and
mental activities in a work setting on a regular and continuing
basis.  A 'regular and continuing basis' means 8 hours a day, for
5 days a week, or an equivalent work schedule."  S.S.R. 96-8P,
1996 WL 374184, at *1 (July 2, 1996).  In making that
determination on behalf of the Commissioner, the ALJ must
consider all relevant evidence in the record, including the
opinions and statements by all medical sources.  20 C.F.R. §
404.1545(a) & 404.1564; S.S.R. 96-5P, 1996 WL 374183, at *4 (July

---

    [6]In addition, the ALJ had the opportunity to observe Yeager
during two hearings that were separated by more than three years.
Based on her testimony, she was taking little or no pain
medication or any other medication to treat her symptoms at those
times.  See Ortiz v. Sec'y of Health & Human Servs., 890 F.2d
520, 523 (1st Cir. 1989).

2, 1996) ; Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001);

Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).  The residual

functional capacity determination must provide a clear

explanation for its evidentiary basis and reasons for rejecting

medical source opinions.  See Fargnoli, 247 F.3d at 41; Clifford

v. Apfel, 227 F.3d 863, 874 (7th Cir. 2000); Newton, 209 F.3d at

456; Goatcher v. HHS, 52 F.3d 288, 290 (10th Cir. 1995).

    The ALJ found that Yeager retained the functional capacity

to lift up to twenty pounds occasionally and up to ten pounds

frequently as long as she was able to alternate sitting and

standing as needed.  He found that she could only do overhead

reaching occasionally and could not do repetitive activities with

her hands.  That assessment is consistent with the ability to do

less than the full range of light work.  In making his residual

functional capacity finding, the ALJ primarily relied on the

assessment done by the state consulting physician, Dr. Fairley.

He rejected Dr. Carr's opinion that Yeager is completely

disabled.  Yeager contends that the ALJ's residual functional

capacity assessment is wrong because the record shows she is not

capable of working on a sustained basis.  She argues that the

residual functional capacity assessment by Dr. Carr is the only

accurate view of her limitations and that the ALJ erred in not

giving Dr. Carr's opinion controlling weight.

    Dr. Carr, who is a specialist in physical medicine and

rehabilitation, completed a physical residual functional capacity

questionnaire on November 9, 2004.  At that time, Dr. Carr had
been seeing Yeager every two to four weeks for eighteen months.
He wrote that Yeager was precluded from working because of joint
pain, low back pain, fatigue, and reduced cognition.  He stated
that she could walk only up to one quarter of a block, could sit
for up to thirty minutes, and could stand for up to ten minutes.
In an eight-hour work day, Dr. Carr indicated that Yeager would
often need bed rest or to recline, that she could stand for less
than two hours, that she could lift less than ten pounds and only
rarely, and that could never twist, bend, crouch, or climb.  He
also said that she had not recently experienced any "good days,"
and that she would miss more than four days of work each month.

     NP Kidder completed physical and mental functional capacity
questionnaires on November 11, 2004, after over three years of
treating Yeager on a regular basis.  NP Kidder found that Yeager
could occasionally lift and carry less than ten pounds and
indicated that she could not lift and carry any weight
frequently.  She found that Yeager could stand for six hours in
an eight-hour work day and had no limitations on her ability to
sit.  NP Kidder also found that Yeager could never climb a rope
or scaffold but that she could occasionally climb stairs,
balance, kneel, crouch, crawl, and stoop.  She found no
limitations in Yeager's capacity for manipulative functions and
communication and no limitations in her mental capacity.
Previously, in July of 2002, NP Kidder found that Yeager could

lift and carry twenty pounds occasionally but could only lift and carry less than ten pounds frequently, that she could stand for less than two hours and would need to alternate between sitting and standing.

Dr. Bishop, who is a doctor of osteopathic medicine, completed a physical functional capacity questionnaire on October 26, 2004, after he had been treating her for three and a half years.  Dr. Bishop found that Yeager was capable of lifting ten pounds occasionally and less than ten pounds frequently.  He found that she could stand for at least two hours in an eight-hour work day and that her capacity to sit was not affected except that she would need to be able to periodically alternate between sitting and standing.  He indicated that her ability to push and pull with her arms was affected but did not explain the degree of limitation.  Dr. Bishop also found that Yeager could never crouch or stoop and that she could only climb, balance, kneel, and crawl occasionally.  Dr. Bishop had not completed a functional capacity assessment when asked to do so in 2002 because he stated that he would have to base his findings solely on Yeager's subjective statements.

Dr. Fairley was a state agency physician who reviewed Yeager's records in January of 2002 and provided a functional capacity assessment, based on those records, that was consistent with an ability to do light work.  He found that Yeager could lift and carry twenty pounds occasionally and ten pounds

frequently, that she could stand for six hours and sit for six hours.  He also found that she would have to avoid work that required frequent bending, stooping, climbing, crawling, kneeling, overhead reaching, and strong grasping.

An ALJ is directed to give controlling weight to the opinion of a treating physician if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2).  On the other hand, an ALJ may give greater weight to the opinion of a non-treating physician or disregard the opinion of a treating physician only if the ALJ first properly considers the following factors:  (1) the frequency of examination and the length, nature, and extent of the treatment relationship, (2) the evidence supporting the treating physician's opinion, (3) the consistency of the opinion with the record as a whole, (4) whether the opinion is from a specialist, and (5) the nature and extent of non-treating sources' explanations for their opinions.  § 404.1527(d)(2) & (d)(3).  If the ALJ decides not to give controlling weight to a treating physician's opinion, however, he is obligated to give good reasons in his decision for making that choice.  § 404.1527(d).  Because the ultimate decision as to disability is reserved for the Commission, a medical source opinion that a claimant is disabled is not a medical opinion and is not entitled to any

weight.   20 C.F.R. § 404.1527(e)(1).

In this case, the ALJ explained that he rejected Dr. Carr's opinion of Yeager's functional capacity as being inconsistent with Dr. Carr's examination notes and with the rest of the record.  The discrepancy the ALJ noted is apparent in that Dr. Carr reported improvement in Yeager's symptoms and functioning capacity over the course of his treatment until the time he was asked to provide his opinion for purposes of Yeager's social security application.  He then found her completely disabled from work due to pain and fatigue.  Dr. Carr's evaluation of Yeager's capacity is markedly different from the assessments done by Dr. Bishop and NP Kidder at the same time, and Dr. Carr had treated Yeager for about half of the time that Dr. Bishop and NP Kidder had treated her.  In addition, Dr. Carr's opinion that Yeager is totally disabled is not entitled to weight.  Therefore, the ALJ did not err in deciding not to give Dr. Carr's opinions controlling weight.

The ALJ's decision to rely on Dr. Fairley's assessment, however, is not properly supported.  The ALJ explained that he found Dr. Fairley's assessment to be more reliable, based on the entire record, because of the wide variations in the findings by Yeager's treating sources.  He does not explain, however, why he ignored the postural limitations found by Dr. Fairley and others. He also does not explain why he did not consider the more recent assessments by Dr. Bishop and NP Kidder to be more persuasive

22

than Dr. Fairley's assessment, which was three years old at the time of the second hearing.  Dr. Fairley's assessment also was based on Yeager's medical records before January of 2002, which did not include Dr. Carr's treatment notes or the more recent records from Dr. Bishop and NP Kidder.  Further, Dr. Bishop is a treating physician whose opinion is entitled to controlling weight unless the ALJ gives good reasons for not following it, which he failed to do in this case.  § 404.1527(d)(2); 20 C.F.R. § 404.1513(a).  Therefore, the ALJ's residual function capacity assessment that Yeager was capable of light work is not adequately explained or supported by the record.

Nevertheless, Dr. Bishop assessed Yeager's residual functional capacity at a level that is consistent with the ability to do sedentary work, with some additional limitations, and NP Kidder's two assessments were similar.[7]  Despite the ALJ's errors, "remand is not essential if it will amount to no more than an empty exercise."  See Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).  Therefore, if substantial

---

[7]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a); see also Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 3 n.2 (1st Cir. 2003).

evidence supports the Commissioner's disability determination, a
remand will not be necessary.

C.  <u>Disability Determination</u>

As part of the disability analysis at step five, the ALJ
must decide whether work exists in sufficient numbers in the
relevant economies that the claimant could do.  <u>Heggarty</u>, 947
F.2d at 995-96.  If the claimant does not have non-exertional
impairments that significantly interfere with a full range of
work at a particular exertional level, the ALJ may rely on the
Grid to determine whether the claimant is disabled.  <u>See</u> <u>Seavey</u>,
276 F.3d at 5.  If, on the other hand, the claimant has
significant non-exertional limitations that would restrict her
ability to do work which would otherwise be appropriate at her
exertional level, the ALJ may use the Grid only as a framework to
guide the disability decision.  <u>Id.</u>  In that case, the testimony
of a vocational expert is necessary.  <u>Heggarty</u>, 947 F.2d at 996.
The Commissioner bears the burden at the fifth step of the
sequential analysis to show that substantial evidence in the
record supports the decision.  <u>Goodermote v. Sec'y of Health &
Human Servs.</u>, 690 F.2d 5, 7 (1st Cir. 1982).

In addition to the identified deficiencies in the ALJ's
residual functional capacity finding, Yeager asserts that the ALJ
failed to articulate a sit-or-stand option to the vocational
expert, improperly relied on the Grid, failed to make a finding

24

as to transferable skills, and failed to resolve a conflict
between the vocational expert's opinion and the Dictionary of
Occupational Titles ("DOT") description of the identified jobs.
Contrary to Yeager's complaints, the ALJ adequately included a
sit-or-stand option in the hypothetical, which the vocational
expert incorporated into his opinions, and did not rely on the
Grid to satisfy the Commissioner's burden at step five.  Further,
the DOT descriptions of the jobs identified by the vocational
expert do not conflict with the vocational expert's opinion as to
the sit-or-stand option.  The vocational expert addressed the
issue of transferable skills and because Yeager has a high school
education, she is considered capable of semi-skilled work.  See
20 C.F.R. § 404.1564(b)(4).  Further, one of the identified jobs
at the sedentary level is non-skilled work.

     Yeager also contends that the hypothetical the ALJ used did
not properly reflect her limitations as Dr. Carr found them and
as the ALJ ultimately found in his decision.  While that is true,
the record nevertheless supports the opinions the vocational
expert provided, which in turn support the Commissioner's
conclusion that Yeager was not disabled.

     The record supports the assessment of Yeager's residual
functional capacity found by Dr. Bishop, which is consistent with
an ability to do work at the sedentary level, with the additional
requirements of a sit or stand option, a limited ability to push
or pull with her arms, a restriction against crouching or

stooping, and only occasional climbing, balancing, kneeling, crawling, and reaching.  The vocational expert responded to the ALJ's hypothetical, which included a sit or stand option and limited her ability to reach and to do repetitive hand activity, by identifying two sedentary jobs, along with two jobs at the light exertional level.  The vocational expert also provided the DOT identification numbers for each of the identified jobs.  The sedentary jobs the vocational expert identified are information clerk and surveillance system monitor.  The DOT descriptions of those jobs show that neither requires the postures that had been limited or precluded by Dr. Bishop.

Therefore, despite the ALJ's errors in this case, substantial evidence exists in the record to support the Commissioner's decision that Yeager is not disabled.   The errors made by ALJ Klingebiel required a remand after his first decision and very nearly required a second remand here.  In the court's experience, decisions issued by ALJ Klingebiel are often reversed and remanded, following judicial review, requiring unnecessary additional expenditures of resources by the court, the claimant, and the Social Security Administration.  A second remand is not necessary here only because substantial evidence in the record happens to support the conclusion that Yeager is not disabled, despite the ALJ's erroneous findings.  It is apparent to the court that ALJ Klingebiel is either unable or unwilling to comply with the review process mandated by the Social Security Administration and the applicable law.

Conclusion

For the foregoing reasons, the claimant's motion to reverse and remand (document no. 9) is denied.  The Commmissioner's motion to affirm (document no. 12) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

April 17, 2006

cc:  Raymond J. Kelly, Esquire
     David L. Broderick, Esquire